# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**GARY SANDLIN and SHERI SANDLIN,**

    Plaintiffs,

v.                                                                                   No. CIV 01-1028 BB/DJS-ACE

**STATE FARM FIRE AND CASUALTY COMPANY,**

    Defendant.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on the defendant's motion for summary judgment (Doc. 5) on the plaintiffs' complaint (Doc. 1), wherein the plaintiffs seek redress for damages arising from the defendant's alleged mishandling of their claim for insurance benefits. The Court has examined the parties' submissions and the relevant legal authorities, and, for the reasons set forth below, finds that the defendant's motion for summary judgment is premature and should therefore be held in **ABEYANCE** pending further discovery.

## I.
## FACTUAL BACKGROUND

Plaintiffs Gary and Sheri Sandlin ("Insureds") purchased a homeowners insurance policy ("Policy") from Defendant State Farm Fire and Casualty Company ("Insurer") in January 1998. (See Insureds' complaint at 2.) At all relevant times, Insureds performed their obligations under the Policy. (See id. at 3.)

On April 16, 2001, Insureds' home and personal belongings were damaged or destroyed by fire. Insureds reported the occurrence to Insurer that same day. Four days later, Insurer's claims

specialist Joe Adam went to Insureds' residence to conduct an inspection of the home's structure and contents. (See Insurer's opening brief, exhibit A.) At the residence, Mr. Adam met with Charles D. Ray, a certified fire investigator retained by Insurer to investigate the cause and origin of the fire. (See id., exhibit A.1.) In the course of the inspection, Mr. Ray formed the opinion that the fire was intentionally set. Insurer advised Insureds the following day that it was reserving its rights on their claim because Insurer questioned "whether the origin and cause of the loss was accidental in nature." (See id., exhibit A.2.)

On April 25, 2001, Mr. Adam took recorded statements from Insureds and two of their neighbors. (See id., exhibit A.1.) Ms. Sandlin told Mr. Adam that she "was last in the home approximately 20-30 minutes before the fire was discovered." However, one of the neighbors contradicted Ms. Sandlin's statement, telling Mr. Adam that "she saw Ms. Sandlin enter the home twice after first leaving at approximately 5:15 p.m." and that "she heard the smoke detector sound shortly after Ms. Sandlin left the first time, and it was still sounding when Ms. Sandlin reentered the home."

On May 4, 2001, Insureds provided Insurer with a sworn proof of loss requesting payment in the amount of $28,676.25 for damage to their home, and in the amount of $22,137.07 for damage to their personal property. (See id., exhibit B.3.) In their sworn proof of loss, Insureds stated their belief that the fire was caused by "a rag behind [the] dryer." The fire department noted in its report that the fire was caused by an oily rag ignited by a malfunctioning clothes dryer.

Also on that day, Mr. Adam drafted a preliminary report. (See id., exhibit A.5.) In his report, Mr. Adam opined that the fire was non-accidental. He based his opinion on the grounds that Mr. Ray believed the dryer was not the cause of the fire as alluded to in Insureds' sworn proof of loss and in

the fire department's investigation report, Insureds allegedly had a motive to start the fire because they were having financial difficulties, and Ms. Sandlin allegedly had the opportunity to set the fire. Mr. Adam acknowledged in his report that the materials he submitted for laboratory analysis tested negative for ignitable liquids.

On June 7, 2001, Insurer received Mr. Ray's investigative report. (See id., exhibit A.5.) Mr. Ray concluded that the fire was of incendiary origin. He noted that "[a]ll electrical artifacts were shipped to Mark Goodson Engineering for further study[,]" and that the study "resulted in the elimination of the submitted electrical artifacts as potential ignition sources for these fires." He further noted that the "work accomplished by Mr. Goodson has scientifically confirmed my observations and field analysis." Insurer allegedly failed to receive Mr. Goodson's engineering report until June 25, 2001, even though it was incorporated into Mr. Ray's report and was dated June 6, 2001. (See id., exhibit A.6.)

On June 19, 2001, Insurer examined Insurers under oath. (See id., exhibits B and C.) In her examination, Ms. Sandlin admitted that her family's financial condition was tenuous. (See id., exhibit B.) She specifically admitted that she had bounced eleven checks drawn on her checking account in September 2000 and that some of their bills, including the mortgage, were not timely paid. Mr. Sandlin disclaimed any knowledge about the checks bounced by Ms. Sandlin. Insurer allegedly failed to receive the signature pages of Insureds' examinations until July 11, 2001.

On July 23, 2001, a claim committee report was submitted to Insurer's regional office for a decision on Insureds' claim. (See id., exhibit A.8.) The report concluded that there was "clear and convincing evidence that Sheri Sandlin intentionally set the fire at the insured location to acquire insurance benefits." The report recommended to the regional office that Insureds' claim be denied

under the provision voiding the Policy if any insured "causes or procures a loss . . . for the purpose of obtaining insurance benefits." In spite of the report, the regional office granted Insureds' claim, because there was "insufficient evidence of the insured intentionally setting the fire and/or engaging in concealment or fraud."

On July 26, 2001, Insurer informed Insureds that it was withdrawing its reservation of rights. (See id., exhibit A.9.) Insurer made payment of $28,676.25 for the damage sustained at the home, which was the full amount claimed by Insureds. Insurer also made payment of $10,312.69 for the damage sustained to Insureds' personal property, which reflects an extension of coverage of $24,745.81 (an amount in excess of the $22,137.07 claimed by Insureds), less $8,970.45 in depreciation and $2,500.00 in prior cash advances. Insurer informed Insureds that they had two years to submit additional claims for replacement cost benefits as they purchased items destroyed in the fire.

## II.
## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a summary judgment motion, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. See Martin v. Kansas, 190 F.3d 1120, 1129 (10th Cir. 1999). However, the court is not "required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones." Lucas v. Dover Corp., 857 F.2d 1397, 1401 (10th Cir. 1988).

# III.
# DISCUSSION

## A.  Insurance Contract

Insureds claim Insurer's motion for summary judgment should be denied as a matter of law, because Insurer allegedly breached the Policy by failing to make a coverage decision within 60 days of receiving their sworn proof of loss. See Insureds' response brief at 10; see also Insureds' response brief, exhibit C at 13. The Policy provides in relevant part:

SECTION I – CONDITIONS

10.    Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. <u>Loss will be payable 60 days after we receive proof of loss and</u>:

    a.    reach agreement with you;

    b.    there is an entry of a final judgment; or

    c.    there is a filing of an appraisal with us.

Insureds contend, without citation to legal authority, that the underlined policy language (added by this Court for emphasis) obligated Insurer "to pay or deny coverage sixty-days after receipt of [Insureds'] proof of loss." Id. at 12. Insureds further contend, again without citation to legal authority, that "limitations (a), (b), and (c) are to make clear that insurer is obligated to pay, but do not effect (sic) the sixty-day time provision." Id.

This Court must, in diversity cases, apply the substantive law of the State of New Mexico. See Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). The New Mexico courts have not addressed the exact issue here raised, so there is no New Mexico law to guide this Court's inquiry. However, for the reasons set forth below, the Court is confident that if presented with the issue the New Mexico

courts would reject Insureds' contention that Insurer was contractually obligated under the Policy to make a coverage decision within 60 days of the date that it received Insureds' proof of loss.

The Policy clearly conditions Insurer's obligation to make payment on more than Insureds' filing a sworn proof of loss. See, e.g., Trzcinski v. American Cas. Co., 953 F.2d 307, 316 (7th Cir. 1992) (ruling that similar policy language "effectively suspended the due date for payment until after final judgment was entered in a case where liability was disputed."); Columbia Cas. Co. v. Southern Flapjacks, Inc., 868 F.2d 1217, 1221 (11th Cir. 1989) (recognizing that similar policy language conditions insurer's obligation to pay on more than insured's filing a proof of loss). Although the Policy clearly contemplates that ascertainment of loss––via agreement, final judgment, or an appraisal award––will follow the filing of a proof of loss, it does not set a timeframe within which ascertainment must occur. See, e.g., Terra Industries, Inc. v. Commonwealth Ins. Co. of America, 981 F.Supp. 581, 596 (N.D.Iowa 1997) (ruling that similar policy language "clearly contemplates that the appraisal demand will be made after the proof of loss is filed, but does not set a deadline for that demand."). Accordingly, while the 60-day deadline for payment applies, it begins to run only after a proof of loss has been filed and ascertainment of loss has been made. See id. at 597, *citing* Meineke v. Twin City Fire Ins. Co., 892 P.2d 1365, 1371 (Az. App. 1994) (rejecting insured's claim that payment had to be made within 60 days of receiving proof of loss); Horn v. State Farm Fire & Cas. Co., 437 F.Supp. 63, 65 (E.D.Okla. 1977). Insurer was not obligated *per se* to make a coverage decision within 60 days of receiving Insureds' proof of loss.

**B.    Additional Discovery**

Insurer claims it is entitled to summary judgment because Insureds "must present evidence of an unreasonable delay" and yet there "is no such evidence in this case." Insurer's opening brief

6

at 11; see Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998) (stating that party moving for summary judgment may satisfy its burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."). In particular, Insurer claims that because there is "evidence that the fire may have been intentionally set, and that Mrs. Sandlin had the opportunity to set it, [Insurer] was justified in further investigating the claim." Insurer's reply brief at 11. There allegedly being no dispute about the chronology of Insurer's investigation, Insurer claims its investigation must be adjudged reasonable and timely as a matter of law. See id.

In response, Insureds have submitted a Rule 56(f) affidavit in which they claim that (as of the date their response brief was filed) they cannot present admissible evidence justifying their opposition to Insurer's motion for summary judgment because of the lack of a meaningful opportunity for discovery. See Insureds' Rule 56(f) affidavit, ¶ 2. Insureds contend that before they can meaningfully respond to Insurer's motion, they first must be allowed to: (1) hire a causation expert of their own to evaluate Insurer's investigations and conclusions, and (2) explore the veracity of Insurer's contentions that it did not possess the information necessary to make a coverage decision until after it received the engineering report on June 25, 2001, and the signature pages from Insureds' statements under oath on July 11, 2001. See Insureds' response brief at 9, 15-16.

Insureds' Rule 56(f) affidavit is well-taken insofar as Insureds have demonstrated a need to conduct discovery on whether Insurer completed its investigation in a timely and reasonable fashion. Insurer, by emphasizing the chronology of its investigation, asks this Court to assume that it was reasonable for Mr. Ray's investigation to persist from April 20, 2001, to June 7, 2001, and that it was reasonable for Insurer's distillation of Mr. Ray's investigation to last from June 7, 2001, to July 23,

7

2001. The Court cannot indulge those assumptions, especially where Insureds have not had the opportunity to conduct discovery.

Insureds also question the persuasive value of the investigation's chronology. Insurer claims that it did not receive Mr. Goodson's engineering report until June 25, 2001, and that it did not receive the signature pages from Insureds' statements under oath until July 11, 2001, thereby drawing its investigation closer to the date that it made a coverage decision. However, Insureds correctly point out that Insurer had the information contained in Mr. Goodson's report since June 7, 2001, the date that it received Mr. Ray's investigative report, which incorporated Mr. Goodson's findings and conclusions, and that Insurer had the information contained in their statements since June 19, 2001, the date the statements were taken. See id. at 15-16. Viewed in the light most favorable to Insureds, the record supports their claim that Insurer did not learn any new facts after June 19, 2001, yet it did not make a coverage decision until more than a month later. Therefore, the Court cannot rule in favor of Insurer as a matter of law because if Insurer deliberately postponed its decision despite having enough facts to render a decision, there is legal precedent to deny summary judgment. See Travelers Insurance Co. v. Monpere, 1997 WL 9792, *6 (W.D.N.Y. 1997) (ruling that whether insurer made a coverage decision in a timely manner is a factual issue that must be adjudged from the date insurer first became aware of sufficient facts to make a decision; ruling that failure to make a coverage decision as soon as was reasonably possible renders the decision ineffective, regardless of whether any prejudice resulted from the delay).

Insureds must limit the scope of their discovery to the facts implicating the timeliness of Insurer's efforts. As Insurer correctly points out, the factual issues of whether the fire was accidental, whether Insureds had a motive to set the fire, and whether Mrs. Sandlin had an opportunity to set the

fire are of minimal relevance in this matter because Insurer paid the claim.  See Insurer's reply brief at 1-2.  Thus, the only relevant issues are whether Insurer's investigation was timely, reasonable, and in good faith.  After Insureds have completed discovery on those issues, they must inform the Court whether they can in good faith oppose Insurer's summary judgment motion and, if so, they must file a response brief explaining why Insurer's investigation was untimely, unreasonable, and lacking in good faith.

## IV.
## CONCLUSION

For the reasons set forth above, the Court finds that the defendant's motion for summary judgment is premature.  An Order in conjunction with this Memorandum Opinion will issue.

DATED at Albuquerque this 19th day of February, 2002.

_____
BRUCE D. BLACK
United States District Judge

**Attorneys:**

For Plaintiffs:

    Judd C. West, Albuquerque, N.M.

For Defendant:

    Terry R. Guebert, Albuquerque, N.M.
    Don Bruckner, Albuquerque, N.M.